DECISION
Poignantly and provocatively, it has been said and sung about hair:
 If little can be found in past cases of this Court or indeed in the Nation's history on the specific issue of a citizens right to choose his own personal appearance, it is only because the right has been so clear as to be beyond question. Justice Thurgood Marshall, dissenting in Kelley v. Johnson, 425 U.S. 238, 251 (1976).
 Gimme a head with hair. Long beautiful hair. Shining, gleaming, Streaming, flaxen, waxen
 Give me down to there hair Shoulder length or longer . . . .
 Hair, hair, hair, hair, hair, hair, hair Flow it, show it Long as God can grow it hair . . . . My hair . . . .
 My hair like Jesus wore it, Hallelujah I adore it . . . .
From the Musical "Hair" — written by James Rado, Jerome Ragni and Gault MacDermott (1966).
The controversy in this matter calls upon the Court to examine a hair length regulation pertaining to male students attending a private high school, and the Court is asked to do so with no precedent on point in this jurisdiction. More specifically, the issue presented is: may a private school admit a male student with hair growing to a point on his back well below the bottom of his shirt collar at a time when the school had no prohibition against such a hairstyle and about which no adverse official comment was made at the time of admission; and then, may that school later adopt a rule mandating that a male student's hair be grown no longer than the bottom of his shirt collar and threaten to expel the student for not conforming his haircut to school regulations?
While our Supreme Court has not spoken directly on this issue, or on any contested private school rules regarding student deportment, it has provided general guidance to lower courts which are called upon to examine rules of private associations. In Hebert v. Ventetuolo, 480 A.2d 403
(R.I. 1984), our Supreme Court articulated the general principle that there should be "no judicial interference with the internal affairs, rules and by-laws of a voluntary association unless their enforcement would be arbitrary, capricious or constitute an abuse of discretion." 480 A.2d, at 407. The Supreme Court put the matter another way as well: "Where such rules are reasonable and in keeping with public policy, there will be no judicial interference with them." Id.
When our Supreme Court uses the word "arbitrary", I ascribe to it the meaning used in normal daily speech, as the Supreme Court did not suggest otherwise. Webster's Collegiate Dictionary provides several definitions of "arbitrary". One indicates a rule or practice "not restrained or limited in the exercise of power: ruling by absolute authority"; and another offers that arbitrary refers to something "based on or determined by individual preference or convenience rather than by necessity or the intrinsic nature of something." Our Supreme Court, however, has emphasized that the term "arbitrary" has the connotations ascribed to it by common usage. An arbitrary action is one that "`has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense.'" [Citation omitted.]Sundlun v. Zoning Board of Pawtucket, 50 R.I. 108, 116 (1929). To be sure, this case does not involve public officials, but the point is well made: an arbitrary action by anyone exercising power is an action that does not have any substantial relation to the health, morals, safety or welfare of the persons who are the subjects of the administrator's or supervisor's action. Arbitrary as used by our Supreme Court in Sundlun is the equivalent of irrational.
Preliminarily, it must be emphasized this case is not about fashion or fashion preferences; it is about the exercise of power and whether that exercise is arbitrary and capricious.
After undertaking the inquiry required by Hebert v. Ventetuolo, it is the conclusion of this Court that the long hair rule, so-called, at St. Raphael Academy has been applied arbitrarily to the young plaintiff, Russell Gorman, III, and that the rule itself is arbitrary and capricious. The Court's reasons follow.
 Significant Facts and Travel of the Case
Russell Gorman, III, entered St. Raphael Academy in Pawtucket, Rhode Island as a 9th grade student at the beginning of the 2001-2002 school year, having successfully completed eight years of parochial school education, passed the St. Raphael's entrance examination, and satisfied St. Raphael's officials at all pre-admission interviews that he was suitable for admission to the St. Raphael's community. At the time of his interview and at all other meetings that he and his parents had with school officials and administrators as part of the admissions process, Russell Gorman, III, styled his hair so that the hair on the top and sides of his head was cropped at a short length, often referred to as a butch or buzz cut, while the hair on the back of his head was grown longer so that it hung down from his head to a locus six to eight inches below his shirt collar. During the application process no St. Raphael official informed plaintiff Russell Gorman, III, or his parents, that this hair style was unacceptable, or commented on his hair at all. When Russell and his parents were notified of his acceptance to St. Raphael Academy in a letter from Brother Aubin dated January, 2001 he was welcomed to the Class of 2005. (Ex.5).
In the autumn of 2001, after beginning his class work and participating in other activities at St. Raphael, the student/plaintiff was advised that he would have to cut his hair or face expulsion. After attempts to avoid this choice through discussions with school officials, the plaintiffs, through counsel, sought injunctive relief in this Court. The Superior Court issued a restraining order barring the younger Gorman's expulsion from St. Raphael for refusal to cut his hair. The basis of the Court's order was that nothing in the Student Handbook for 2001-2002 or any of the documents constituting the contract between plaintiffs and the school mandated the length of hair favored by school officials for males; and no school official had remarked on any potential problems with Russell's hair when he went through the pre-admission process. The parties could not agree on the form of the order to be entered or whether additional evidence should be received by the Court at a hearing on a preliminary or permanent injunction. On September 25, 2001 this Court issued a restraining order in favor of the plaintiffs, the effect of which was to allow Russell Gorman, III, to "attend all classes, functions, extra-curricular activities including but not limited to sports and school social events;" and the order also provided "that the right of the minor plaintiff to attend St. Raphael Academy is not limited or conditioned upon the length of his hair, except to the extent that the minor plaintiff shall comply with all rules and regulations of St. Raphael Academy." St. Raphael Academy objected to the form of this order.
On April 23, 2002 another order was issued without objection by St. Raphael. This order referenced the earlier temporary restraining order of the Court and provided: "(1) that the defendant St. Raphael Academy and all persons acting in concert with it, agents, servants, employees, officers and attorneys are restrained and enjoined from interfering with the normal matriculation and participation of Russell Gorman, Jr. [sic] at St. Raphael's Academy and participation in all other activity conditioned upon his adherence to all rules and regulations of St. Raphael's Academy; (2) that by agreement of the parties and for good cause shown, that this order shall remain in full force and effect in accordance with the order of the Court."
In sum, so far as the 2001-2002 school year was concerned, this Court restrained the expulsion of Russell Gorman, III, on the basis of hair length, but the young plaintiff was naturally obliged to follow all other school rules and regulations.
Toward the end of the 2001-2002 school year, St. Raphael Academy adopted a new Hair Code and included it in its Student Handbook for the 2002-2003 school year. (The language that appeared in the Handbook for the 2001-2002 school year is in regular type while the amendments are in italics:)
 All students must keep their hair clean and well groomed. Outlandish hairstyles (ex. any designs, lettering, Mohawks, pony tails, etc. engraved/cut into their hair; spiked; hair dye can only be of natural colors, (reds, blues, greens, etc. are not natural colors) and are not in keeping with the school's education mission and will not be tolerated. A boy's hair may not be longer than the bottom of his shirt collar. Hair should be neat and not flamboyant for all students. Students who do not conform to these regulations are subject to disciplinary action and possible dismissal if the problems persist. Boys must also be clean shaven.
It should be noted that St. Raphael Academy is a private school operated by a Roman Catholic religious congregation known as the Brothers of the Christian School (TR — 7). Brother Daniel Aubin is the principal and was the defendant school's only witness regarding the provenance and purpose of the hair code. The school has 498 students, 53% of whom are boys and 47% are girls. (TR — 21). Racially and ethnically, according to Brother Aubin, 55% of the school are classified as white, 23% Portuguese, 27% minority, meaning according to Brother Aubin "black, Hispanic, Asian." (TR — 21). The age of school students is, as one might expect, 13 through 18; and the school draws its student population primarily from Pawtucket, Central Falls, Lincoln, Cumberland, Attleboro, Seekonk and East Providence. (TR — 22).
Brother Aubin testified at considerable length during the course of the trial. He indicated that he has been principal at St. Raphael Academy since August of 2000, having come to the school from a high school outside Rhode Island. He said that when he arrived at the school he found it to be "lacking in discipline," and that "things had gotten away from him [his predecessor]". (TR — 22). Among the examples cited by Brother Aubin regarding a breakdown in discipline was that students with automobiles were permitted to leave the campus and go to their cars during free periods. When asked to elaborate on this lack of discipline, Brother Aubin indicated:
 The biggest [problem] was respect for teachers. Again, there were also groups within schools. There was a tough element of students that were — harassing was too strong of a word, but influencing other students in terms of being themselves. (TR — 23).
Brother Aubin also bemoaned the existence of cliques and bullying, particularly among "older students, juniors and seniors. . ." (TR — 24). When Brother Aubin arrived at the school in August of 2000, the dress code regarding wearing apparel in effect today defined standards then as well, but Brother Aubin noted that sometimes shirts would come out of people's trousers and they were not being reprimanded for this. Brother Aubin testified that he believed the existence of haircut regulations would promote a culture of calmness and order (TR-26) in the school, thereby facilitating the attainment of the school's mission. The school mission statement found in the Student Handbook for 2002-2003 (Ex. 6) reads:
 St. Raphael Academy is a Catholic coeducational, college preparatory school founded in the tradition of St. John Baptist deLaSalle and rooted in the gospel of Jesus Christ. The Academy welcomes a student body that is academically, economically and culturally diverse. Through its commitment to Christian values, the Academy strives for excellence in all programs for the spiritual, academic, cultural and physical development of each student. St. Raphael Academy seeks to provide a safe environment that places priority on mutual respect as well as self-discipline. The Academy prepares each student for a life dedicated to learning, leadership and service to the Church and community.
Nowhere in his testimony did Brother Aubin ascribe any disciplinary problems prior to his arrival at St. Raphael to the length or style of hair favored by any one student or group of students. Nowhere in his testimony did Brother Aubin suggest even remotely that the length of one's hair had any causal relationship to attaining the goals of the school's mission. Brother Aubin was clear that one with shoulder length hair could be a good Christian, and conversely, one with no hair at all may fall far short of attaining Christian virtue. As if to prove this point, testimony elicited from Brother Aubin clearly indicates that plaintiff Russell Gorman, III, has been a model student, achieving honor role grades, participating on the freshman basketball team, and being free of disciplinary infractions. (TR — 38-39). Moreover, Russell's hair length did not distract any other students from their pursuits, nor did it provoke any tumultuous behavior on the part of other students (TR — 89), and no faculty member complained about — or even spoke of — Russell's hair.
The defendant Academy neither argued nor offered to prove that hair length has anything whatsoever to do with the dogma or rules of the Roman Catholic Church. The defendant Academy did not suggest in any way that long hair on males presents any sort of hygiene or safety problem; and indeed, there is no prohibition against female students wearing their hair in such fashions that it can fall well beneath the bottoms of their shirt collars.
According to Brother Aubin, the only difficulty engendered by Russell's hair was his being called "mullet head" or "mullet boy" by one or two other students. Brother
Aubin said that the meaning of this term is that "it's passi, it's old, you know, belongs to another generation, it's not hip. It's not something that on the student body is something that is — that would help an individual in adolescence fit into — with his peers." (TR 20-21).
Brother Aubin was disingenuous in answering questions put to him by the Court regarding responsibility for the use of such nicknames or pejorative epithets.
 The Court: . . .who's responsible for the nickname? The person with the long hair or the person who calls the name?
 The Witness: Could be both.
 The Court: So if someone hurls an epithet at a black person, is it the black person's fault or the person who hurls the epithet? The so-called N or Nigger word.
 The Witness: It would be the person who threw the remark.
 The Court: Who used the epithet. Same way calling a person who is overweight, fat. So is it the person who's overweight fault or the person who used the epithet?
 The Witness: I guest, I'm not trying to be glib, Your Honor, I guess if the person isn't doing anything to help bring down the weight, does that person — it's a question I have — hold some responsibility?
 The Court: Well, they may hold responsibility about their health, but do they hold responsibility for the person who calls them the name, or is it the sole responsibility of the person who says "Okay Fatso"? Who's at fault there? The person with the weight problem or the person hurling the epithet?
 The Witness: Primarily the person throwing the epithet.
 The Court: And what responsibility does the person who's overweight have? Any? Regarding the use of that nickname?
 The Witness: I think if the person were to lose weight, okay, and not be in that category, they may not have that spoken about them.
In effect, Brother Aubin has arrogated to himself a vast and unbridled discretion relative to the use of uninvited and pejorative nicknames. His criteria appears to be that if a person's characteristic is immutable, such as gender, sexual orientation or skin color, then demeaning nicknames or insults are not the responsibility of the victim of this language, but if someone can change his or her appearance by losing weight or cutting one's hair, then the victim is responsible, at least partially, for the actions of boors and bullies who hurl the remark. As for his part, Russell Gorman, III, testified that no member of the St. Raphael community — student, faculty, or administrator — ever called him a name or criticized him in any way regarding his hair style.
Another discretionary power claimed by Brother Aubin in his capacity as principal of St. Raphael is his prerogative to determine what is "outlandish" or "flamboyant" in terms of hair style. He testified that though no reference is made to cornrows, this style, often favored by some African-Americans wherein hair is braided into rows which then rest tightly against the scalp or hang from it, presents no problem and is permitted at St. Raphael; but he is not sure what he would do with hair of African-American students braided and weaved into the longer, fuller style known as dreadlocks. (TR. 83-84). Similarly, although there is no prohibition against shaving one's head totally, Brother Aubin said he would not tolerate that appearance within the student body at St. Raphael. (TR. 88). The reason for the prohibition against baldness is that "it would be a distraction". (TR. 88).
At the outset of the current school year, 2002-2003, in the summer prior to the commencement of classes in which Russell Gorman, III, would be enrolled as a 10th grader, counsel for both sides approached me relative to the recently enacted Hair Code and its impact on the relationship between the plaintiffs and the Academy. Clearly, the student and his parents were of the opinion that young Russell should be permitted to wear his hair style regardless of the enactment of the rule, and the school felt that with a rule now in place they were free to require him to either cut his hair or leave the school community. While the issue of the existence or non-existence of a contract, as well as any prerogatives that St. Raphael — or any other private school — enjoys to change the terms and conditions of a student's enrollment after the student has completed a year at the school must be examined, it is also incumbent upon this Court to look to the pronouncement by the Rhode Island Supreme Court in Hebert v. Ventetuolo, 480 A.2d 403 (R.I. 2984) for guidance as it undertook to examine the rule in question and the contentions of the adverse parties.
Pending a hearing and decision by the Court on the Hair Code issue, the parties agreed, albeit without any stipulation or order, that Russell would enter his tenth grade year but would keep his hair tucked into the back of his shirt while attending classes and going about his other activities as a student. Sometime in early September when he reported to have his picture taken for inclusion in the yearbook, he sat for his portrait with his hair removed from the back of his shirt. When Brother Aubin learned of this he determined that the student should be placed on in-house suspension, meaning that Russell could not attend his classes or participate in extracurricular activities, but would be permitted to receive 80% credit. Russell's parents balked at this and Russell did not attend school for 12 days or so, at which time he was re-admitted to classes on the advice of counsel, according to Brother Aubin. I note this sub-plot, not because any existing court order was violated, either by the student in withdrawing his hair from his collar temporarily for the purpose of a photograph or because the punishment was arguably draconian in light of the agreement reached between counsel and the pending court hearing, but rather to determine whether the adoption and application of the hair regulation has been directed at Russell Gorman, III, rather than motivated by a legitimate concern for discipline at St. Raphael.
A fact not to be overlooked and which will be discussed below is that St. Raphael Academy, like all private schools in Rhode Island, could not exist without the license and approval of the State of Rhode Island Department of Education; and in fact, it was it's state license that the defendant school submitted as its first full exhibit. While private schools enjoy the right to foster their educational objectives employing means that permit considerable discretion on the part of school authorities and teachers, there are a number of state imposed strictures to which a private school must adhere. These rules, found in Court's Exhibit 1, cover a host of categories from graduation requirements, fire drills, health, etc., but it is the reference in the regulations to the school's mission statement and educational policy as well as instruction "in the principles of popular and representative government" that has relevance to this litigation. In pertinent part, the Department of Education Standards for Approval of Non-public Schools in Rhode Island provide:
 9. Each school shall have a clearly stated educational policy, cooperatively developed and written by the faculty and administration. The statement shall set forth the objectives of the school and the philosophy underlying the method used to attain these objectives. The performance of each school shall be judged against its policy statement.
 10. Each school shall have a carefully planned program of study and activities, consistent with its policy and objectives, which shall be approved by the Commissioner of Education.
 11. Each school shall provide all children in attendance with instruction in reading, writing, geography, arithmetic, the history of the United States, the history of Rhode Island, and the principles of American government, each shall be taught in the English language. This does not deny the right to teach said subjects or any other subject in any other language in addition to the teaching in English. (16-19-2) (Emphasis supplied).
 12. Each school shall provide all children in attendance with instruction in the principles of popular and representative government as enunciated in the Constitutions of Rhode Island and the United States. . . . . in every high school thorough instruction shall be given in the Constitution and Government of Rhode Island and in the Constitution and Government of the United States. (16-22-2). (Emphasis supplied).
 13. In the study of history of the United States and of Rhode Island, there shall be included the major contributions made by African-Americans and other racial and ethnic groups in the development of the United States and the State of Rhode Island.
Lastly, it is necessary to observe that the plaintiffs make no challenge to the dress code, which was in existence at the time they applied and which has not been changed since. To point to the obvious, a hair regulation visits its requirements on a student after he or she has left the school grounds and its consequences are found at the dinner table and in bed while the student sleeps. Uniforms can be removed and tossed aside at the end of the day, but one's hair cannot.
 A Case of First Impression
This is a case of first impression in Rhode Island; that is, the Rhode Island Supreme Court has not addressed the question of whether a private school may permissibly govern its male students with a rule that requires them to cut their hair in such a way so that it will not rest at any point below the bottom of their shirt collars. Additionally, neither counsel has submitted any authority of the Rhode Island Supreme Court examining the lawfulness of a private school rule regarding any aspect of student conduct or appearance.
To say that there is no clear precedent to resolve the controversy, however, does not mean that we are without guiding principles articulated elsewhere which address private associations generally. Two such principles can be gleaned from Hebert v. Ventetuolo, supra. The first is the general proposition "that there should be no judicial interference with the internal affairs, rules and by-laws of a voluntary association . . ." 480 A.2d 407. The second principle is in the form of an exception to that rule: Courts may examine the internal rules of a private association and their application to its members when "their enforcement would be arbitrary, capricious or constitute an abuse of discretion." 480. A.2d 407.
Against the backdrop of these general legal principles, how is equity to resolve the controversy between the student and St. Raphael Academy? The answer lies in the methodology of the common law and its precept that courts working without a controlling precedent carefully examine the background and circumstances of the controversy, the directions — such as they are — from precedent in related areas of the law, lessons from history, sociology, philosophy, logic, etc. And to this mix, we can surely add that quality judges regularly admonish jurors to draw upon — common sense.
It is difficult to find a more eloquent or thoughtful exposition on the topic of common law analysis than Mr. Justice Cardozo's tractate, The Nature of the Judicial Process, first published in 1921, some eleven years before he began his six-year tenure as an Associate Justice of the United States Supreme Court.
Justice Cardozo's slim classic is filled with insights on every page, and a few are worth noting as being of particular assistance in resolving a case such as the one now before the Court. Determined to explain the process of judging, especially as it relates to filling what he described as "fissures in the common law", and alert that "with new conditions there must be new rules," Justice Cardozo described a method whereby the judge looks carefully at the world around him or her, with the assistance of the disciplines of the humanities and social sciences. Against the charge that his description of how judges adjudicate was idiosyncratic or novel, the distinguished jurist wrote:
 But in truth its method is not new. It is the method of the great chancellors, who without sacrificing uniformity and certainty built up the system of equity with constant appeal to the teachings of right reason and conscience. It is the method by which the common law has renewed its life at the hands of its great masters — . . . . Benjamin N. Cardozo, The Nature of the Judicial Process, pp. 137-138 (Yale University Press 1921).
It is incumbent upon the judge, wrote Justice Cardozo, to
 . . . base his judicial decision on elements of an objective nature. And that is why the activity which is proper to him has seemed to me capable of being justly qualified: free scientific research libre recherchi scientifique: free, since it is here removed from the action of positive authority; scientific, at the same time, because it can find its solid foundation only in the objective elements which science alone is able to reveal to it. The Nature of the Judicial Process, supra, at p. 121.
Nearly seventy years after the publication of Justice Cardozo's credo, a prominent federal trial judge described the methodology in earthier terms:
 I have to take into account what is going on in trying to decide what to do about something. There is no other way you can do my kind of job in a big urban community without knowing what is going on in the world. The idea that you put it all out of your mind and you apply absolute legal principles is a mistaken idea. The fact is that I am absolutely bound by precedent. I must follow it. My oath tells me that I have to follow it.
 There is, however, not much precedent out there, and, frankly, precedent is frequently confused and goes both ways.
 Suppose you have a case involving people who are getting cancer from the environment. You know perfectly well the Founding Fathers did not deal with that. It is such a recent phenomenon that there is no particular precedent. You may think this precedent or that precedent or some other precedent is applicable. Depending on the related facts, you can bring an action in the field of tort, or you bring it in the field of contract, or you can find some lurking constitutional principle. What a judge does to be fair and to get a fair result, which is the big thing, is to try to explore all those aspects to see how best that particular complex situation, whatever it is, fits our basic standards of decency. (Gerhard A. Gessell, Perspectives on the Judiciary, 39 Am. Univ. Law Review, 475, 511-512 (1990). (Emphasis supplied).
What does the common law analytical method mean for this controversy between the Gormans and St. Raphael Academy and the controlling principle of Hebert v. Ventetuolo noted above? In simplest terms, it means that it is necessary to look both within the school setting at St. Raphael as well as outside the school walls. St. Raphael's mission statement must be considered and accepted as valid and lawfully permissible, given the licensing of St. Raphael by the Rhode Island Department of Education. The recently enacted prohibition relative to the length of a male student's hair must be evaluated in relation to the goals articulated in the mission statement; and there is, of course, the related question of whether the rule was changed simply to coerce Russell Gorman to cut the hair that presented no problems when he was accepted into the Class of 2005.
And following Justice Cardozo, it may fairly be asked if conditions at St. Raphael and in the wider community have changed in such a way as to warrant either the Hair Code rule or a judicial declaration that the rule is arbitrary and without any rational basis.
 The Law of Private Associations
As noted above, the law in Rhode Island relative to private associations is governed by Hebert v. Ventetuolo and the principle enunciated therein that courts must be cautious regarding any interference with the internal affairs of such groups, but they may intrude if a member can prove that he or she is prejudiced through a breach of contract on the part of the group's controlling powers or is the victim of arbitrary and capricious rules or the application of otherwise appropriate rules in an arbitrary manner.
Jurors and legal commentators have long been aware of the disparate types of private associations bound together only by the high passions disputes within them engender. One of the twentieth century's greatest scholars of freedom of expression and equity jurisprudence had this to say:
 The bitterness of a dispute is apt to be inversely proportionate to the area of conflict. Family rows are proverbial for their violence. A similar acerbity pervades quarrels in clubs, trade unions, professional associations, secret societies, churches and educational institutions. Zechariah Chafee, Jr., The Internal Affairs of Associations Not for Profit, 30 Harv. L. Rev. 993, 993 (1930).
Clearly, private associations differ from each other in their goals and objectives as well as the constituencies that they serve. Labor unions differ from bowling leagues which in turn differ from private schools. Professor Iris Young has contributed to the study of private associations and their community roles by defining three rubrics under which the various types of private groups and organizations may be placed:
 Private associations is self-regarding in the sense that it is activity for the participants or members of the association. Families, social clubs, private parties and gatherings, many of the activities of religious organizations, are all examples of private association. . . . Private associations tend to be inward-looking and particularist. . . .
 Civic associations, on the other hand, are primarily directed outward from those engaged in them to others. Activities with a civic purpose aim to serve not only members, but also the wider community. Civic associations claim to make some contribution to the collective life of the neighbourhood, city, country or world. . . .
 Political association is distinct from both private and civic association in that it self-consciously focuses on claims about what the social collective ought to do. Political activity consists in voicing issues for public debate about what ought to be done, what principles and priorities should guide social life, what policies should be adopted, how the powerful should be held accountable, and what responsibilities citizenship carries. Iris Marion Young, Inclusion and Democracy, pp. 160-163 (New York 2000) (Italics is the author's).
The mission statement of St. Raphael and the testimony of Brother Aubin leave no doubt that the defendant school can be placed under Professor Young's rubric of "civic association". While St. Raphael has the role of developing the educational and spiritual life of its students, it has adopted for itself the goal of sending its graduates into the community to function as productive and aware citizens in a democracy. Toward this end, during the course of their four years of studies St. Raphael's students are expected to leave the school grounds and work with organizations in the community that the school determines are also committed to improving the quality of life. Brother Aubin was clear on this point. When asked by the Court if it was the "desire and an objective of St. Raphael's . . . to send these students upon graduation out into the wider community with a commitment to their faith but also to the community and community service," his answer was "Yes." To a follow-up question as to St. Raphael "inculcating values into students who will be hopefully desirably active participants in a democracy," his answer also was "Yes." (TR — 92).
St. Raphael Academy argues strenuously, through counsel, that the United States Supreme Court case of Boy Scouts of America, et al. v.Dale, 530 U.S. 640 (2000), requires this Court to rule in favor of St. Raphael and dismiss plaintiffs' petition for injunctive relief. In my view, any fair reading of that case leads to an outcome in favor of the student, that is, if one determines the holding of Dale by applying established principles of the common law, discussed in Arthur L. Goodhart, Determining the Ratio Decidendi of a Case, 40 Yale L. Jour. 161 (1930).
James Dale was a young man who had been in scouting all his life and who became an adult member of the Boy Scouts of America in 1989, at which time he began service in that organization as a Scout Master. When scouting officials learned that he had publicly admitted that he was homosexual and that he had become an advocate for lesbian and gay teenagers, they revoked his membership. Dale filed suit in the New Jersey court system and finally obtained a judgment from the New Jersey Supreme Court holding that his exclusion from the Boy Scouts on the grounds of homosexuality was a violation of New Jersey public accommodations law. The United States Supreme Court, in a 5-4 decision, thought otherwise, and reversed.
Central to the United States Supreme Court's holding was that the Boy Scouts of America is an "expressive association," that is, a group formed to publicly and privately express a particular viewpoint about human conduct, especially as it relates to the behavior of young boys and men who affiliate with the organization. The Supreme Court noted the mission statement of the Boy Scouts, its famous Scout Oath and Scout Law, as well as its traditional opposition to homosexuality. 530 U.S., at 649-653.
The United States Supreme Court understood its task clearly:
 Given that the Boy Scouts engages in expressive activity, we must determine whether the forced inclusion of Dale as an assistant Scout Master would significantly affect the Boy Scouts' ability to advocate public or private view points. 530 U.S., at 650 (emphasis supplied).
 The ultimate conclusion of the Supreme Court was that:
 The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints. 530 U.S., at 648 (emphasis supplied).
It is easy to see, then, that for the Supreme Court the question was whether or not Dale, being not simply homosexual, but an outspoken advocate of gay and lesbian rights, significantly affected the Boy Scouts as it legitimately went about it's own mission of advocating a contrary viewpoint regarding ethical behavior and sexual conduct for young males in particular:
 We have already concluded that a state requirement that the Boy Scouts retain Dale as an Assistant Scout Master would significantly burden the organization's right to oppose or disfavor homosexual conduct. 530 U.S., at 659.
It is patently obvious that homosexuality, by definition, involves a particular type of sexual conduct, potential or actualized, and Dale was an advocate for persons who wanted this conduct approved, respected and legitimized. A hairstyle, however, expresses no viewpoint, and indeed, one with either long hair, or short hair, or no hair at all, could either agree or differ with the mission statement of St. Raphael, and behave accordingly. The hair style itself has nothing to do with the mission statement, nor does the mission statement in any way seek to define a hair style, or more important, contain within it objectives that can be reached only if one has a particular cut to his or her hair. On the contrary, once the Boy Scouts made it clear that they did not in any way condone or approve of homosexuality, someone advocating that type of conduct, or at least its respect and toleration by the non-homosexual community, impeded the goals of the Boy Scouts of America.
While St. Raphael Academy independently crafted its mission statement and fixed for itself the goal of producing intelligent citizens with democratic values, the Rhode Island licensing authority, namely the Department of Education, mandates that all private schools instruct its students in democratic values, federal and state constitutional principles, and representative government. Moreover, the Department of Education has expressly declared that the continuation of the certification by the State of St. Raphael Academy — or any private school for that matter — is contingent upon a satisfactory evaluation by state educational officials concluding that the school is meeting the objectives of its mission statement.
We may state this governmental regulatory scheme as follows: Our State Constitution mandates that the Legislature foster education and "[the] diffusion of knowledge, as well as of virtue among the people", the framers having concluded that this diffusion of knowledge was "essential to the preservation of their rights and liberties"; and to bring about this condition for the flourishing of democracy in Rhode Island, the Constitution further enjoined the legislature "to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education. . ." R.I. Const., Art. XII, Sec. 1. The legislature lawfully delegated the implementation of this mandate to the State Department of Education, which in turn concluded that private schools were suitable vehicles, operating under appropriate conditions and requirement, to participate in the attainment of the objectives enunciated in the Constitution.
It is apparent, then, that private schools in Rhode Island share with public schools the important mandate of educating students to participate appropriately as citizens in a democracy. In short, private schools discharge a crucial public responsibility. The facts and law that lead to a disposition of this case, as well as the contentions of the adverse parties, do not require the analysis adverted to in Brentwood Acad. v.Tenn. Secondary Sch. Ath. Assoc'n., 531 U.S. 288 (2001) or West v.Atkins, 487 U.S. 42 (1988) to determine if there is enough state entwinement to lead to a legal finding of state action; however, the public duties of St. Raphael Academy, which the school itself acknowledges, cannot be overlooked; and it is these public duties that qualitatively distinguish St. Raphael from a private bowling league or chowder and marching society.
 Hair Analysis
The contract questions, such as they are, surrounding this controversy are not complex, and the controlling law is well-established. The application forms and school handbook, as well as the acceptance letter (Ex. 5) forwarded by Brother Daniel Aubin to the Gorman family, are all in evidence. It is clear from the acceptance letter that the parties at that time intended that Russell Gorman, III would enter the 9th grade class and graduate with his fellow admittees four years later as the Class of 2005 of St. Raphael Academy.
It is also beyond cavil that private schools can change their rules as they see fit from time to time, even during the period between the admission of a freshman class and its graduation four years later. It is just as indisputable, however, that any changes made to controlling rules and regulations should be enacted in good faith and not bespeak the arbitrary or capricious. The United States Court of Appeals for the First Circuit put this principle succinctly: "Rhode Island recognizes that virtually every contract contains an implied covenant of good faith and fair dealing between the parties." Crellin Technologies, Inc. v.Equipmentlease Corp., 18 F.3d 1, 10 (1st Cir. 1994). This was confirmed by the Rhode Island Supreme Court in Centerville Builders, Inc. v.Wynne, 683 A.2d 1340, 1342 (R.I. 1996).
The inquiry of this Court, therefore, must be whether the defendant private school acted in good faith when it changed its Hair Code from one that did not prohibit a male student's hair to grow beneath the bottom of his shirt collar to one that contained such a prohibition. To phrase this aspect of the case a different way, was the Hair Code changed to address legitimate concerns that would facilitate the school's attaining the goals contained in its mission statement, or was its enactment directed specifically at Russell Gorman, III, in order to coerce him to cut his hair or face the consequences of expulsion if he did not? Infusing this analysis is the question of whether the rule that gave rise to this aspect of the litigation is arbitrary on its face.
St. Raphael, through its principal, asserts the right to adopt such a rule regarding the length of a male student's hair because it has concluded that the cropping of hair before it transgresses the bottom of the shirt collar will contribute to a certain uniformity, which in turn will lead to "calmness" at the school, thus facilitating the attainment of the school's mission. The necessity of such a rule had gone unnoticed by all prior principals and vice-principals at St. Raphael, and was not a concern of those officials who admitted Russell Gorman, III, to the class of '05 at a time when his hair cascaded below his collar just as it does today, and just as it apparently did, without incident, during the years he attended the Woodlawn Regional Catholic School for the first nine years of his schooling.
Implicit in the defendant's claim of authority to enact such a rule is the power to enact a rule that would require all male students — or even the female students — to grow and crop their hair in a certain way. If the school can legitimately order the students not to let their hair grow below the bottom of the collar, then there can be no rational restriction on school officials who wish to change the code to require that hair must be grown to a point four inches below the bottom of the collar, or that heads must be shaved completely.
Disputes about the hair length and style of students, especially males, are not foreign to American courtrooms. Most of the hair battles were waged in the 1970's and involved public school students; and it should not come as a surprise to anyone that decisions can be found on both sides of the issue. Richards v. Thurston, 424 F.2d 1281 (1st Cir. 1970), the controlling authority regarding hirsute male students in public schools in this jurisdiction, collects the divergent opinions during the course of its ruling in favor of a long-haired student. 424 F.2d, at 1283 (n. 3).
While rejecting the student's argument that the right to grow his hair to his shoulders was a fundamental constitutional right requiring a showing of a compelling reason by state authorities to require him to style his hair otherwise, the First Circuit ruled that, absent a rational basis demonstrating the pedagogical or disciplinary necessity of such a rule, the school officials could not force young Mr. Richards to cut his hair shorter than he wished:
 . . .liberty seems to us an incomplete protection if it encompasses only the right to do momentous acts, leaving the state free to interfere with those personal aspects of our lives which have no direct bearing on the ability of others to enjoy their liberty. 424 F.2d, at 1284-1285.
The Richards court recognized the need to balance the competing interest of the student and the administrators who legitimately wished to maintain discipline in the school so that the educational process could proceed without distraction. Having concluded that the student had a liberty interest in growing his hair as he saw fit, the Court required the school officials to prove the hair length interfered with their legitimate objectives:
 Once the personal liberty is shown, the countervailing interest must either be self evident or be affirmatively shown. We see no inherent reason why decency, decorum, or good conduct requires a boy to wear his hair short. Certainly eccentric hair styling is no longer a reliable signal of perverse behavior. We do not believe that mere unattractiveness in the eyes of some parents, teachers, or students short of uncleanliness, can justify the proscription. Nor, finally, does such compelled conformity to conventional standards of appearance seem a justifiable part of the educational process. 424 F.2d, at 1286.
The First Circuit also made note of the distinction between a hair regulation and one pertaining to a dress code:
 . . .a school rule which forbids skirts shorter than a certain length while on school grounds would require less justification than one requiring hair to be cut, which affects the student 24 hours a day, 7 days a week, 9 months a year. 424 F.2d, at 1285.
St. Raphael Academy is not a public school, but much of the analysis in this controversy is necessarily similar to that in Richards, given the arbitrariness standard enunciated in Hebert v. Ventetuolo, supra. Just as in Richards v. Thurston, no evidence has been produced by the defendant here tending to prove that long hair worn by males affects the educational process, discipline or decorum of the school. On the contrary, it is uncontradicted that Russell Gorman, III, is an honor student with an unblemished disciplinary record, and his hair style, worn without restriction during the freshman year, caused no distractions to any person and did not lead to any incidents or confrontations with other students or faculty members. It should be noted also, that the long hair and beards permitted faculty members has not caused any difficulties in the St. Raphael community.
During final argument, the Academy, through counsel, conceded that it was "inconsistent" for the school to allow teachers to have long hair and beards while at the same time asserting that the school's mission would be thwarted if male students appeared with such fashions; but inconsistency is not synonymous with irrelevancy, as St. Raphael would have it, and this Court concludes that the defendant's argument that the length of one's hair within the St. Raphael community somehow has an impact on the ability of the school to achieve the objectives set forward in its mission statement is undercut by allowing teachers — who are indeed role models for students — to wear their hair, or bare scalps, and beards any way they choose.
See also Westley v. Rossi, 305 F.Supp. 706 (5th Div, Minn. 1969), reciting a litany of difficulties school officials contended a male's long hair would cause, but failed to prove.
The evidence in this case is especially telling in favor of Russell Gorman, III because his 9th grade year functioned as a laboratory experiment regarding the stated concerns of the St. Raphael administration. Though he had hair seven or eight inches below his shirt collar, Russell was able to attain an average higher than 90 in his academic subjects. He was a member of the freshman basketball team and otherwise comported himself as a model student. It is indeed anomalous that St. Raphael is saying to him, in so many words: "You are an honor student, you give us no disciplinary problems whatsoever, you behave properly with your fellow students and with teachers, you are — in short — progressing very favorably toward the achievement of the goals we have set for you — but if you don't cut your hair we will bounce you out of here, just as we would someone who possessed a weapon or sold drugs on the campus."
There is not a scintilla of evidence on the record in this case that males wearing long hair will in any way deter St. Raphael Academy from its declared mission. On the other hand, the rule not only threatens to suspend or expel students who transgress it, but it requires the student, as well as his parents, to conduct a significant aspect of their lives under the regimen of St. Raphael even when off school grounds and not involved in any school activity. This Court takes judicial notice of the significant time, expense and creativity devoted by persons of both sexes to their appearance, including their hair styles and how they present themselves to their family members and the world at large. This is hardly a phenomenon limited to the United States in the early years of the 21st century.
As Chief Judge Wyzanski wrote when he ruled in favor of the long-haired student after trial in the United States District Court in Richards v.Thurston:
 Whether hairstyles be regarded as evidence of conformity or individuality, they are one of the most visible examples of personality. This is what every woman has always known. And so have many men, without the aid of an anthropologist, behavioral scientists, psychiatrists, or practitioner of any of the fine arts or black arts. Richards v. Thurston, 304 F.Supp. 449, 451 (D.Ma. 1969).
The length and style of hair presents a qualitatively different situation from the color and cut of wearing apparel. St. Raphael Academy can easily justify its dress code on grounds as simple as wishing to be able to identify its students among other persons on the public streets as they walk from one campus to another; and St. Raphael Academy could also legitimately claim that it does not wish its students to be ogling the interesting patterns or materials chosen by others, or to be comparing designer names and logos on their pants and sneakers when they should be paying attention to more uplifting matters. However, at the end of the day the students can discard their school uniforms and adorn themselves with blue jeans, cargo pants or anything else they wish; but there is, alas, no way they can replace or restyle hair that has been cut to fit the prohibitions of St. Raphael's hair code. This being so, St. Raphael Academy intrudes in an unwarranted and unnecessary manner into the home and off-campus life of Russell Gorman, III. As the United States Supreme Court said in Moore v. City of East Cleveland, 431 U.S. 494
(1997):
 Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural. 431 U.S. at 503 (1977).
The Supreme Court went on to cite with approval the remarks of Mr. Justice Goldberg in his concurring opinion in Griswold v. Connecticut,
remarking that "the traditional relation of the family" is `a relation as old and as fundamental as our entire civilization."' Moore, supra, at 504 (n 12), citing Griswold v. Connecticut, 381 U.S. 479, 496 (1965) (Goldberg, J. concurring).
Thus St. Raphael Academy, whether consciously or unwittingly, intrudes into the hallowed ambit of family life as it seeks to discharge a governmental mandate through the operation of its governmentally licensed school. During final argument, through its attorney, St. Raphael argued that it has within its prerogatives the right to tell its students what music they may or may not listen to when they are at home, an unenforceable prohibition if ever there was one, but it is referenced here as further evidence of the absolute authority St. Raphael arrogates to itself as it carries out public as well as private functions.
St. Raphael has, of course, a legitimate interest in whether St. Raphael's students besmirch the image of the school by criminal conduct, and no Court would preclude the expulsion of a student who, for example, is convicted for assault with a dangerous weapon, sexual harassment, stalking or the like. The style of one's hair, however, does not present any problem whatsoever for the community beyond the walls of St. Raphael Academy. Indeed, if stores, gas stations or hotels were to refuse the patronage of males with long hair there would be no end of litigation, not to mention the loss of business. This Court takes judicial notice that the Pope, on his highly publicized visit to a youth festival in Canada this past summer, distributed the sacrament of communion to many of the youngsters who attended, and he imposed no prohibition against any person because of his or her appearance or hair style.
 Conclusion
The hair code regulation found in the St. Raphael student handbook for 2002-2003 is arbitrary and capricious so far as the regulation pertaining to the length of a male student's hair is concerned. It is arbitrary and capricious because it bears no rational relation to the legitimate mission statement of the school, nor does it any ways inhibit or enhance the learning process or order and discipline at the school. In short, the length of a male student's hair is absolutely irrelevant to the educational process and the culture of calm and respect that the school wishes to foster during the school day.
St. Raphael Academy functioned for many years without any such rule; and whatever disciplinary problem St. Raphael had with its students prior to the arrival of Brother Aubin in the summer of 2000, none of them can be attributed to the length of a boy's hair, and Brother Aubin produced no evidence suggesting that they did. When the new rule was crafted, Brother Aubin admitted, on cross-examination by the Gorman's attorney, that the name of Russell Gorman, III, was discussed by those seeking to draft a long hair regulation. The only reasonable inference this Court draws is that there would never have been a long hair prohibition adopted if Russell Gorman and his family had not insisted that he be permitted to keep the style of hair he had at the time of admission to the class of 2005.
St. Raphael takes the position that they are absolutely autonomous and free to enact any rule they wish regarding student appearance; and no authority, great or small, external to the school can thwart their prerogatives. In other words, regarding the Hair Code, the Gormans can take it or leave it. This posture assumes that by entering into a contract with St. Raphael, the Gormans have consented to the imposition of even the most arbitrary rules at any time during Russell's four-year stay there; and concomitantly, if the Gormans — or any parents and students involved with the school — object, the school has the ever-ready rejoinder: "if you don't like it here, you can leave." To borrow an observation from a recent important work in political theory that examines the role of governmental authority and how it intersects with the prerogatives of sub-cultures within the larger community: "This doctrine of implied consent assumes that those who have not used the exit option have implicitly agreed to their own subordination." Ayelet Shachar, Multicultural Jurisdiction: Cultural Differences and Women's Rights, p. 42, and passim (Cambridge 2001).
The issues presented to this Court by Russell and his parents involved only the provision of the Hair Code pertaining to length. It was necessary for the Court and counsel for the parties, however, to examine the rule in its entirety; and to the extent that other hair styles were discussed on the record, either by way of testimony and colloquy between the Court and counsel, it must be said that what pertains to long hair surely pertains to no hair, i.e. a shaved head, or other styles that young people adopt. But the principle infirmity of the rule, when examined as a whole, is that the disciplinary officials at St. Raphael retain an unbridled discretion regarding the hair styles favored by their students. For example, Brother Aubin testified that he permits cornrows to be worn by black male students, but prohibits a shaved head by any student, and is unsure as to what his response would be to dreadlocks styled by a black student; and he holds these positions even though the rule is silent regarding cornrows, a shaved head, and dreadlocks.
Counsel for St. Raphael was invited to submit any book or treatise he could locate on the connection between hair length and the educational process, but none was produced. I took it upon myself to review numerous writings on education and the philosophy of education, but could locate no statements regarding hair. Indeed, even those writing from a Christian perspective focused on concerns of a deeper, more essential nature than personal appearance. See, e.g. John Cardinal Newman, The Idea of a University (New York 1947 — first published in 1852); Ivan Illich, Deschooling Society (New York 1970); and Paulo Friere, Pedagogy of the Oppressed (New York 1970). Even the famous aphorism attributed to President James A. Garfield — "The ideal college is Mark Hopkins on one end of a log and a student on the other" — does not suggest that the log would tip one way or the other depending on the amount of hair on the head of either the student or Professor Hopkins. St. Thomas Aquinas himself undoubtedly would put hair length under the rubric "accident" , using the term philosophically to distinguish it from that which is essential; surely, he would consign hair, along with skin color, gender, and ancestral origin, to a status somewhere between irrelevant and inconsequential regarding the acquisition of knowledge or the development of character and a commitment to compassion and social service.
So there is no possible confusion on the part of those who may think that the Court is opening the door for improper governmental meddling into the affairs of private schools, this Decision does not in any way interfere with the curriculum of St. Raphael Academy, its mission statement, or the doctrines of the Roman Catholic Church with which it is affiliated.
It is tempting to conclude succinctly by paraphrasing Pink Floyd, at least so far as hair styles are concerned: " Leave the kids alone!" However, it is more prudent to close where the analysis for this Decision began, the dynamic of the common law.
Oliver Wendell Holmes famously said "The life of the law has not been logic; it has been experience", Oliver Wendell Holmes, Jr., The Common Law (Boston, 1881), but his aphorism hardly meant that he jettisoned logic. See e.g. O.W. Holmes, The Path of the Law, 10 Harv. L. Rev. 61 (1897).
Justice Cardozo had occasion to comment on Justice Holmes' famous pronouncement ". . .Holmes did not tell us that logic is to be ignored when experience is silent." Cardozo, Supra at 33. Fortunately, in this case it has been possible to draw on both experience and logic. The experience at St. Raphael Academy is proof positive that the length of a student's hair has nothing to do with the educational process, nor does it have anything to do with fostering a culture that in turn will facilitate the school's attaining its stated mission.
Logic teaches us the same thing, but also something more. Private schools are different from private bowling leagues, private yacht clubs and private advocacy groups. Private schools are licensed by the state to educate children in large part as they see fit, but with the express condition that they educate children to be citizens in a democracy. It would be anomalous indeed if people entrusted with this important mission were permitted to impose a 24-hour rule mandating a purposeless conformity to an arbitrary hair code. Democracy does not require — nor has it ever required — robots. Children protect themselves when they learn to question authority and say "no" to the arbitrary. Yesterday's headlines teach us this. As Professor Chafee observed more than seven decades ago: ". . . an institution which professes to prepare youth for life in a democracy might wisely give them an example of fair play when it is conducting its own affairs." Chafee, supra, at 1027.
Lurking in the interstices of all arbitrary authority is usually some cruel irony. In the instant matter, it would be painfully ironic if students who affected the hair style of Jesus Christ and his Disciples were barred from St. Raphael while the school admitted and encouraged only those whose hair styles mimicked those of the Enron and Global Crossings Boards of Directors.